THOMAS et al. v. ROSS.

(Circuit Court of Appeals, Fifth Circuit. June 15, 1896.)

No. 481.

NEGLIGENCE—MASTER AND SERVANT—SAFE PLACE.

One R. was employed by the foreman in charge of the track hands on a railroad operated by a receiver, and was taken, with other track hands, to a cut on the line of the road, and set to shoveling dirt onto a flat car. On the day before R. was employed and set to work, the bank at the side of the cut had been undermined for two or three feet, and wedges had been driven into the earth at the top of the bank, in order to throw the earth down. The bank had been left in this condition overnight, during which rain had fallen. No notice was given to R. of the condition of the bank, and it could not be discerned from the place where he was working. Shortly after R. began work, the bank of earth fell upon him and killed him. *Held*, that leaving the bank in such dangerous condition was negligence, for which the receiver was liable.

Appeal from the Circuit Court of the United States for the Southern District of Georgia, Western Division.

Marion Erwin, for appellants.

T. E. Ryals and Wm. T. Stone, for appellee.

Before PARDEE and McCORMICK, Circuit Judges, and PARLANGE, District Judge.

PARLANGE, District Judge. The appellee, Sarah Ross, by intervention, sued the receiver of the Central Railroad & Banking Company of Georgia for the value of the life of her husband, one Lawyer Ross. She alleged in her petition that on or about October 26, 1892, her husband was engaged in the service of the receiver, as a track hand, and that he was working in a cut called "Blue's Cut," about a mile and a half from Macon, Ga.; being one of a squad of hands employed in loading a construction train with dirt. Appellee alleged that the cut was about 15 feet deep, and that the side of the cut, on the day preceding her husband's death, had, under the direction of the agents of the receiver, been undermined at the bottom to the depth

of 2½ to 3 feet, and two crowbars had been driven in from the top, at about 3 or 4 feet from the brink of the cut, to loosen the dirt on the side of the cut. Appellee further alleged that on the night preceding her husband's death a rain had further loosened the dirt at the place where the crowbars had been driven in, and that, while her husband was engaged in shoveling dirt from the bottom of the cut, the side of the cut, because it had been undermined and loosened as stated, fell down upon her husband, and killed him. Appellee further alleged that her husband was entirely free from fault, that he had been employed by the agent of the receiver only on the day of the accident, and that he was in total ignorance of the condition of the side of the cut, and was in no way apprised of the dangerous character of the work which he was directed to do. The petition further charges that the accident was the result of the failure on the part of the receiver's agents to exercise ordinary and reasonable care, and that the undermining of the side of the cut, and the driving in of the crowbars at the top of the cut, without due caution, and the requiring appellee's husband to work at the bottom of the cut after the rain of the preceding night, and without in any manner apprising him of the dangers of the situation, constitute gross negligence on the part of the receiver's agents. Thomas & Ryan are the purchasers of the railroad, and they have assumed the liabilities of the receivership.

The general method of operating the cut was as follows: The men would undermine the bank. Iron wedges, about four feet long, would be driven down in the top of the bank about three feet from the brow of the bank, and in that manner great blocks of earth would be thrown down. From these blocks the hands would shovel the dirt upon the flat cars, which would be standing very near to, and parallel with the bank. The custom was for the regular hands to assemble in the morning at the tool house in Macon. They would load the picks and shovels on the flat cars in Macon, and the hands would then ride out to Blue's Cut on the cars. When the cars would reach Blue's Cut, it was not unusual for a number of men to be found there, awaiting the arrival of the cars, in the hope of securing work.

The first point of contention is whether Lawyer Ross was employed by the receiver's agent, the foreman. After carefully considering the evidence on that point, we are satisfied that Ross was employed by the foreman. Virtually, the only testimony for appellants on that part of the case is the evidence of the foreman. The general effect of his testimony on our minds is that he had no clear recollection on the subject of Ross' employment, and that in testifying he relied mainly on his general custom in employing hands. While a few of his statements might, if standing alone, have force as contradicting evidence, yet his evidence, taken as a whole, impresses us only in the manner stated. As against this quasi negative testimony, we find the positive evidence of several witnesses who testify that Ross was engaged at the tool house in Macon before the cars left that place. This evidence is fortified by other circumstances established in the case. As it was the foreman's general custom to employ new hands at the cut, his mind seems to have been mainly directed to the question whether he engaged Ross at the cut. But appellee's contention is that Ross

was engaged in Macon. Neither the foreman nor the conductor nor the fireman (the only witnesses for appellants) could say that Ross did not ride out on the cars with the regular hands. It seems perfectly clear that Ross did ride with the regular hands. Several witnesses so state directly, and it is not denied. Nor is it denied or questioned that Ross, when he was dug out from the earth which had fallen on him, was found with one hand grasping a shovel; and there is direct testimony that he was shoveling dirt when the bank fell. The foreman testified on cross-examination that he had a man on the cars who watched the tools when the cars reached Blue's Cut. We are clear that Ross was in the employ of the receiver, and we are equally clear that the receiver was liable by reason of the fault of his agents.

Ross was engaged by the foreman on the morning of the accident. He had reached the cut but a few minutes when he was killed while in the act of shoveling dirt. The preceding evening, the iron wedges had been driven down into the top of the bank. No reason is attempted to be given for leaving the work overnight in such dangerous condition. It rained during the night. No warning of any kind, or intimation of the danger, was given Ross. It was a physical impossibility for him to see the iron wedges driven down into the bank above him. He knew nothing of the dangerous condition brought about by the driving down of the wedges, and he could not have known it, under the circumstances, by the exercise of due care. The flat cars were drawn up a few feet from the bank, rendering escape almost impossible if the earth should fall. Under such circumstances, the receiver was liable. We find here no application for the doctrine of the nonliability of the master for an injury to one of his servants resulting from the negligence of a fellow of the injured servant. Nor does the doctrine of the assumption of risks come into play. A very different case would be presented if Ross had previously participated in the work, and knew the manner in which the work was being carried on, or if Ross had known, or should have known, of the danger. The danger was not a patent one, with knowledge of which Ross was chargeable; for we find that the proximate cause of his death was the driving down of the iron wedges, in connection with the time which had elapsed since they had been driven down, the undermining, and the rain which fell during the night. The concurrence of these circumstances constituted a highly-dangerous situation, which Ross did not know. The decree of the lower court is affirmed.